UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL NETT,

   Petitioner,         Hon. Janet T. Neff

v.                Case No. 1:10-CV-924

MARY BERGHUIS,

   Respondent.

_____/

## REPORT AND RECOMMENDATION

   This matter is before the Court on Nett's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Nett's petition be **denied**.

## BACKGROUND

   As a result of events which occurred between 1999 and 2004, Petitioner was charged with four counts of Third Degree Criminal Sexual Conduct and two counts of Fourth Degree Criminal Sexual Conduct. (Trial Transcript, June 19, 2008, 19-20). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Stacie Kubic Snively**

As of 2003, Snively was employed as a police officer with the Hannahville Police Department.  (Trial Transcript, June 19, 2008, 201-03).  Sometime prior to 2003, Snively's sister, Nancy Jayne, alleged that "something improper" occurred when she received "chiropractic" treatment from Petitioner.  (Tr. 201-03, 220-21).  In response, Officer Snively agreed to seek treatment from Petitioner and surreptitiously record video of each encounter.  (Tr. 203-04).

Snively was treated by Petitioner on three occasions during 2003.  (Tr. 201-04).  On each occasion, Snively was instructed to remove her clothing (except for her underwear) and "get into the gown."  (Tr. 207).  On each occasion, Petitioner began by performing a chiropractic adjustment after which he performed a massage.  (Tr. 207-08).  Snively described in detail what occurred during her second visit to Petitioner's clinic in July 2003.[1]  (Tr. 209-18).

The encounter began with Snively laying face down on a table.  (Tr. 210).  As Petitioner massaged Snively's back, Petitioner exposed and rubbed the sides of Snively's breasts. (Tr. 210).  Petitioner massaged "inside [Snively's] underwear and down to [her] thighs."  (Tr. 216). Petitioner then began massaging Snively's lower legs in such a way as to cause her foot "to flex. . .and hit[ Petitioner's] groin area."  (Tr. 210-11).  Petitioner then instructed Snively to lay on her back so that he could "adjust [her] upper chest area."  (Tr. 211).  As part of this procedure, Petitioner removed Snively's gown and massaged her breasts.  (Tr. 211-14).

---

[1]   The video Snively recorded during this encounter was shown to the jury, but is not part of the present record.

**Todd Formolo**

As of April 2005, Formolo was employed as Detective Lieutenant with the Kingsford Department of Public Safety.  (Trial Transcript, June 19, 2008, 223).  In April 2005, Detective Formolo interviewed Petitioner at his office.  (Tr. 223).  Two additional individuals were present during the interview, Detective Sergeant Bellanger and Petitioner's receptionist, Erin Brennan.  (Tr. 223).  Petitioner was not under arrest and the interview was recorded.[2]  (Tr. 224).

Petitioner acknowledged that he provided massages to his patients as part of his treatment.  (Tr. 226-27).  When Petitioner was asked whether he ever touched any of his patient's breasts or vaginal areas, Petitioner responded, "no, it could not have happened."  (Tr. 227).  Petitioner subsequently offered that, "if it did happen, it was unintentional."  (Tr. 227).

**Nancy Jayne**

In the spring of 2002, Jayne sought chiropractic treatment from Petitioner for her neck, hips, and lower back.  (Trial Transcript, June 20, 2008, 4-6).  After completing the necessary paperwork, Jayne was escorted to a treatment room and instructed to "take everything off except for [her] underwear and then put one of the gowns on."  (Tr. 7).  The gowns that Petitioner made available to his patients had "only one fastener," located at neck level, and were "open" all the way to the bottom.  (Tr. 8).

After performing a chiropractic adjustment on Jayne, Petitioner instructed her to lay face down on the massage table.  (Tr. 9-11).  Because of the way that the gown was designed, when Jayne laid down the gown "gapped open on both sides" leaving her "totally exposed."  (Tr. 8).

---

[2]  Portions of this interview were played for the jury, but are not part of the present record.

3

Petitioner began by massaging Jayne's head.  (Tr. 11).  As Petitioner did so, he kept "leaning his groin onto [Jayne's] head."  (Tr. 11).  Petitioner then began massaging Jayne's torso, eventually reaching "underneath [Jayne's] body" and "ma[king] contact all the way around [Jayne's] breast on both sides."  (Tr. 11-12).  Petitioner then moved to the front of the table, reached down the length of Jayne's back, reached inside Jayne's underwear, "cupped [her] butt, and pulled [her] even harder into his groin" revealing that Petitioner had an erection.  (Tr. 13-15).  When Jayne responded to this maneuver by "breath[ing] in hard," Petitioner immediately removed his hands from Jayne's body, instructed Jayne to "get dressed," and "walked out."  (Tr. 13).

**Carol Seda**

Beginning in January 2004, Seda sought treatment from Petitioner for pain she was experiencing in her neck, shoulder, and lower back.  (Trial Transcript, June 20, 2008, 27).  On each of her four visits to Petitioner's clinic, Seda was instructed to wear a gown under which she wore only underwear.  (Tr. 29).  Petitioner's method of treatment was identical on each of Seda's four visits, a chiropractic adjustment followed by a massage.  (Tr. 30).

Seda discerned nothing inappropriate during her initial treatment with Petitioner, but "felt things weren't right" after her second treatment as Petitioner's massages "started getting longer."  (Tr. 30).  On Seda's third treatment, Petitioner, after performing a chiropractic adjustment, instructed Seda to lay face down on the massage table.  (Tr. 31-32).  After massaging Seda's neck and shoulders, Petitioner placed his hands under Seda's underwear and began to massage her "butt." (Tr. 32-33).  Petitioner then began massaging Seda's "inner thighs."  (Tr. 33-34).  Then, after instructing Seda to lay on her back, Petitioner began massaging Seda's breasts.  (Tr. 35).

4

On her next visit to Petitioner's clinic, Seda was accompanied by her husband who remained in the treatment room throughout. (Tr. 37). Petitioner began by performing a chiropractic adjustment after which he instructed Seda to move to the massage table. (Tr. 37). Petitioner appeared "nervous" and performed a "very quick" massage during which he did nothing inappropriate. (Tr. 37-38).

**Vanessa Carl**

Carl, who was experiencing lower back pain, began treatment with Petitioner in August 1999. (Trial Transcript, June 20, 2008, 45-48). Carl treated with Petitioner until August 2004. (Tr. 48). Each session with Petitioner was conducted in the same general manner, a chiropractic adjustment followed by massage. (Tr. 49).

Until Carl's final treatment, Petitioner did nothing which Carl felt was inappropriate. (Tr. 50-51). Carl's final session with Petitioner proceeded as usual, a chiropractic adjustment followed by a massage. (Tr. 51-52). During this particular massage, however, Petitioner engaged in conduct which he had previously not engaged. (Tr. 51-57). Specifically, as Carl lay face down on the massage table, Petitioner began rubbing Carl's "buttocks." (Tr. 52-53). Petitioner then instructed Carl to lay on her back. (Tr. 53). Petitioner then began massaging Carl's pubic area while simultaneously pulling Carl's head into "his crotch area." (Tr. 53-55). Petitioner then penetrated Carl's vagina with one of his fingers. (Tr. 55-57).

5

**Theresa Sexton**

Sexton began treating with Petitioner in July 2001 following her involvement in an automobile accident.  (Trial Transcript, June 20, 2008, 65-68).  Each session with Petitioner proceeded in the same general manner, Sexton was instructed to "disrobe and put on a gown" after which she would receive a chiropractic adjustment followed by a massage.  (Tr. 68).

Sexton felt "uncomfortable" following her initial massage because she "wasn't sure if that was what they were supposed to do."  (Tr. 69).  Carl's second massage began with her laying face down on the massage table.  (Tr. 69).  Petitioner then began massaging Sexton's "buttocks."  (Tr. 69).  After Sexton rolled over and laid on her back, Petitioner began massaging her breasts.  (Tr. 69-70).  Petitioner then began massaging Sexton's pelvic region coming into "contact with" Sexton's vagina.  (Tr. 70-71).  Sexton nevertheless returned to Petitioner for a third treatment because she "just did not believe in [her] own instincts."  (Tr. 72).  On this particular occasion, Petitioner eventually began massaging Sexton's breasts after which he penetrated her vagina with his fingers.  (Tr. 72-78).

**Barbara Ann Neuens**

Beginning in late 1994 or early 1995, Neuens began receiving chiropractic care from Petitioner to treat her lower back pain.  (Trial Transcript, June 20, 2008, 85-87).  Each treatment session with Petitioner proceeded in the same general manner, Neuens was instructed to "take [her] clothes off" and put on a gown after which she would receive a chiropractic adjustment followed by a massage.  (Tr. 88-89).

Neuens' next to last session with Petitioner began with a chiropractic adjustment after

6

which she was instructed to lay face down on the massage table. (Tr. 91-92). As Petitioner was massaging Neuens' left leg and groin area, he "moved his hand under [her] underwear and was pressing on the top of [her] crotch" with his fingers. (Tr. 93-94). When performing this maneuver, Petitioner "said something about pressure points." (Tr. 93-94).

Despite Petitioner's conduct, Neuens nevertheless "decided to go back one more time." (Tr. 94-95). When asked why she made this decision, Neuens indicated, "because [Petitioner] telling me it was pressure points, being a doctor, I guess not knowing enough and having a lot of back pain." (Tr. 95). On Neuens' next visit, Petitioner again performed a chiropractic adjustment followed by a massage. (Tr. 95). During this massage, Petitioner again began massaging Neuens' "vaginal area" and then penetrated Neuens' vagina with his fingers. (Tr. 95-96).

**Carrie Kramer**

Kramer began treating with Petitioner in July 2000. (Trial Transcript, June 20, 2008, 106-07). Each treatment session with Petitioner proceeded in the same general manner, Kramer was instructed to "take of [her] clothes except for [her] panties and socks and put the gown on," after which she would receive a chiropractic adjustment followed by a massage. (Tr. 107-10).

Kramer's next to last treatment session with Petitioner began with a chiropractic adjustment followed by a massage. (Tr. 110-12). This massage began with Kramer laying face down on the massage table. (Tr. 112-13). Petitioner started massaging Kramer's back soon after which he began to "grab" Kramer's "buttocks." (Tr. 112-13). Petitioner then lifted one of Kramer's legs and began massaging "the whole leg." (Tr. 113-14). As Petitioner performed this maneuver, he penetrated Kramer's vagina with one of his fingers. (Tr. 114-15).

Despite Petitioner's conduct, Kramer returned to Petitioner one final time. (Tr. 115). When asked why she returned, Kramer responded that Petitioner had not previously engaged in any such activity and she "thought it was an accident." (Tr. 115-16). On Kramer's next visit, Petitioner again performed a chiropractic adjustment followed by a massage. (Tr. 116). Petitioner began by massaging Kramer's back and buttocks after which he raised one of Kramer's legs and began massaging her inner thigh. (Tr. 116-18). Petitioner then again penetrated Kramer's vagina with one of his fingers. (Tr. 118-19).

**Catherine Fulcher**

As of October 2005, Fulcher was employed as a health investigator for the State of Michigan. (Trial Transcript, June 20, 2008, 126-27). One of Fulcher's duties in this capacity was to investigate allegations against licensed health care professionals. (Tr. 127). In October 2005, Fulcher interviewed Petitioner in response to an allegation made against Petitioner. (Tr. 127-28).

When asked if he had massaged Nancy Jayne's breasts, Petitioner responded, "this is not true." (Tr. 132). When asked if he had massaged Carol Seda's breasts, Petitioner stated that "he did not do this" and that Seda "was having trouble with her insurance." (Tr. 132-33). When asked if he has massaged Vanessa Carl's breasts and penetrated her vagina with his finger, Petitioner replied that he "absolutely did not do this." (Tr. 133-34).

**Mary Ninomiya**

Ninomiya visited Petitioner's clinic on a single occasion seeking treatment for lower back pain. (Trial Transcript, June 20, 2008, 138-39). Ninomiya was instructed to "take off

8

everything but [her] underwear" and put on a gown.  (Tr. 139-40).  Ninomiya "thought it was a joke," but nevertheless complied.  (Tr. 139).  Petitioner did not perform a chiropractic adjustment, but instead began by "feeling [Ninomiya's] spinal area [and] lower back."  (Tr. 141-42).

Petitioner then instructed Ninomiya to lay on her back after which he began massaging her breasts.  (Tr. 142-43).  When Ninomiya questioned Petitioner about what he was doing, Petitioner "became very defensive" and instructed Ninomiya to "not tell him how to conduct his exam."  (Tr. 143-44).  Petitioner then resumed massaging Ninomiya's breasts.  (Tr. 144).  Ninomiya then "just got up and left."  (Tr. 144-45).  She later told her boyfriend, an assistant prosecutor, that he needed "to get a special investigator in there and figure out what's going on."  (Tr. 145).

**Candace Arnold**

Arnold visited Petitioner's clinic on one occasion in 1990 or 1991 seeking treatment for lower back pain.  (Trial Transcript, June 20, 2008, 151-55).  Petitioner instructed Arnold to "remove [her] clothing other than [her] underpants" and put on a gown.  (Tr. 153).  When Arnold asked why this was necessary, Petitioner responded that he needed to "check all of your bone structure and so forth."  (Tr. 153).  Despite feeling uncomfortable about the request, Arnold complied.  (Tr. 153-54).

After asking Arnold to touch her fingertips to the floor, Petitioner instructed Arnold to lie face down on the massage table.  (Tr. 154-55).  Petitioner began massaging Arnold's body "to loosen up the muscles and so forth."  (Tr. 155).  Petitioner then began massaging Arnold's buttocks, at one point "slipping his fingers to some degree inside [her] panties."  (Tr. 155-56).  When Arnold

asked "what he was doing," Petitioner responded "that there were nerves running in that area and it would help relieve the pressure on my lower back." (Tr. 156). Petitioner then instructed Arnold to "sit up," at which point he began massaging her shoulders. (Tr. 156). When Petitioner began massaging the "tops" of Arnold's breasts, she again asked Petitioner, "what are you doing?" (Tr. 156-57). Petitioner responded that, "all of this is connected and it interacts with your lower back." (Tr. 156-57). Petitioner then told Arnold that she "had beautiful hair like his daughter." (Tr. 157).

**Glenda Steinbrecher**

Steinbrecher began treating with Petitioner in 2000. (Trial Transcript, June 20, 2008, 163-64). Each treatment session with Petitioner proceeded in the same general manner, Steinbrecher stripped down to her underwear and put on a gown, after which she would receive a chiropractic adjustment followed by a massage. (Tr. 165-66).

Steinbrecher's final treatment session with Petitioner began with a chiropractic adjustment followed by a massage. (Tr. 166-67). Petitioner began by massaging Steinbrecher's back and shoulders. (Tr. 167-68). After instructing Steinbrecher to lay on her back, Petitioner began massaging her breasts. (Tr. 168-70). Petitioner then began massaging Steinbrecher's legs and "groin area." (Tr. 171). With respect to Steinbrecher's groin area, Petitioner informed her that there were "pressure points in that area." (Tr. 171). As Petitioner was massaging this area of Steinbrecher's body, he penetrated Steinbrecher's vagina with one of his fingers. (Tr. 171-72).

10

**James Somers**

Somers began practice as a chiropractor in 1968.  (Trial Transcript, June 23, 2008, 4-5).  Somers served for eight years on the Michigan Board of Chiropractic.  (Tr. 6).  In this capacity, Somers participated in the review and resolution of ethics complaints against chiropractors.  (Tr. 6-11).  Somers also taught classes concerning ethics and proper doctor/patient "boundaries" for 12 years.  (Tr. 10-11).

Somers explained that under Michigan law medical doctors receive a "full-body license" that permits them to "treat anything," whereas chiropractors receive only a "limited license" that limits them to "the examination, analysis and treatment of - of spinal subluxations and misalignments that would produce nerve interference."  (Tr. 13-14).  With respect to the treatment of spinal subluxations and misalignments, Somers testified that chiropractors are "licensed to adjust or manipulate them, reduce them if you will, mechanically or with - with approved apparatus like adjusting instruments."  (Tr. 14-15).  Somers explained that chiropractors are also permitted to "use nutritional advice [and] rehabilitative exercise."  (Tr. 15).

Somers testified, however, that massaging of the breast or vagina did not constitute acceptable chiropractic treatment and, moreover, was unethical.  (Tr. 18-20).  Somers made clear that he could envision no circumstance in which it would be appropriate or ethical for a chiropractor to massage a patient's breasts or vagina.  (Tr. 18-20).

**Margo Fairbanks**

Fairbanks received an Associate's Degree in physical therapy in 1978 and a Bachelor's Degree in recreational therapy in 1979.  (Trial Transcript, June 23, 2008, 26-27).  Several

years later she attended chiropractic college.  (Tr. 27-28).  As part of her training in physical and recreational therapy, Fairbanks received training in the field of massage which she utilizes in her chiropractic practice.  (Tr. 28-29).  Fairbanks indicated that massage "helps in the correction of spinal subluxations."  (Tr. 29).  Fairbanks indicated, however, that massage of the breasts or vagina does not constitute appropriate chiropractic treatment and, furthermore, is an "unethical. . .infringement on personal boundaries."  (Tr. 29-31).


**Marilyn Nett**

Nett married Petitioner in 1981.  (Trial Transcript, June 23, 2008, 39).  Petitioner and Nett separated in 2001 and obtained a divorce in 2003.  (Tr. 56-58).  For the eight years prior to their separation, Nett served as Petitioner's office manager.  (Tr. 40, 58).  During the time that she was employed by Petitioner, Nett never observed a patient "running out, being upset, [or] not being happy with the appointment."  (Tr, 55).

Following her separation from Petitioner, however, Nett discontinued working for Petitioner and thus had no knowledge of what transpired at Petitioner's clinic after 2001.  (Tr. 58). Nett acknowledged that Petitioner wanted his female patients to remove their clothing (including their bra) except their underwear and wear a gown.  (Tr. 45-50).  Nett acknowledged that as part of their divorce Petitioner was ordered to pay her alimony.  (Tr. 59-60).  Nett also acknowledged that she was not present in the treatment room when Petitioner performed chiropractic adjustments or massages.  (Tr. 63).  Nett further reported that "the majority of the time" Petitioner kept the door to his treatment room closed.  (Tr. 70).

**Jane Triest**

Triest received treatment, including massages, from Petitioner for "many years." (Trial Transcript, June 23, 2008, 78-79). Triest "never" had any complaints about the treatment she received from Petitioner. (Tr. 80). Triest testified that, in her opinion, Petitioner had "a good reputation for sexual morality." (Tr. 80-82).

**Erin Brennan**

Brennan was employed by Petitioner from 2002 through 2005. (Trial Transcript, June 23, 2008, 88). Brennan never observed a patient "leaving an appointment upset" with Petitioner. (Tr. 94). Brennan received chiropractic treatment from Petitioner and "never felt uncomfortable around" him. (Tr. 94-95).

**Tammy Conley**

Conley received chiropractic treatment from Petitioner for several years during which time Petitioner never acted unprofessionally. (Trial Transcript, June 23, 2008, 104-06). Conley testified that, in her opinion, Petitioner has "a good character." (Tr. 106).

**Gene Byrge**

Byrge received chiropractic treatment from Petitioner for several years during which time Petitioner's conduct and methods were consistent with those of other chiropractors from whom Byrge received treatment. (Trial Transcript, June 23, 2008, 108-11). Byrge also testified that, in his opinion, Petitioner has a "good reputation." (Tr. 111).

13

**Margaret Stauber**

Stauber received chiropractic treatment from Petitioner for several years during which time Petitioner acted like "a perfect gentleman." (Trial Transcript, June 23, 2008, 115-17).

**Kim Flood**

Flood received chiropractic treatment from Petitioner for several years during which time he "never touched [her] inappropriately." (Trial Transcript, June 23, 2008, 120-22). Flood testified that, in her opinion, Petitioner has a good reputation for sexual morality. (Tr. 122). Flood conceded, however, that her husband was a police officer, a fact of which Petitioner was aware. (Tr. 124).

**Barb Tatar**

Tatar received chiropractic treatment from Petitioner for several years during which time he never touched her "improperly." (Trial Transcript, June 23, 2008, 146-49). Tatar testified that there was never "any sexual implications" in the treatment she received from Petitioner. (Tr. 149).

**Lynn Nolan**

Nolan received chiropractic treatment from Petitioner for several years. (Trial Transcript, June 23, 2008, 187-89). Nolan testified that in her opinion Petitioner "is a very moral person." (Tr. 189).

14

**Sherry Martin**

Martin received chiropractic treatment from Petitioner for several years during which time Petitioner never acted inappropriately.  (Trial Transcript, June 24, 2008, 4-6).  Martin testified that in her opinion Petitioner "is a very kind, caring individual."  (Tr. 5-6).

**Jackie Bellefeuil**

Bellefeuil received chiropractic treatment from Petitioner for several years during which time Petitioner never acted inappropriately.  (Trial Transcript, June 24, 2008, 9-11). Bellefeuil testified that in her opinion Petitioner has a good reputation for sexual morality.  (Tr. 11).

**Michael Nett**

Petitioner testified that he performed massage on his patients as a way of treating fibromyalgia and myofascial pain syndrome.  (Trial Transcript, June 23, 2008, 176-87, 192-205). Petitioner acknowledged that he required patients to wear a gown on their initial visit, but asserted that thereafter such was the patient's choice.  (Tr. 205-07).

Petitioner denied massaging Nancy Jayne's breasts or grabbing Jayne's buttocks and pulling her head into his groin area.  (Tr. 225-28).  Petitioner denied massaging Stacie Snively's or Carol Seda's breasts.  (Trial Transcript, June 24, 2008, 27-50).  With respect to Vanessa Carl's allegations that he massaged her "pubic area" and inserted a finger into her vagina, Petitioner acknowledged that he "palpate[d] the top of the synthesis pubis," so that he could "find out just how inflamed it was," but denied ever touching her vagina.  (Tr. 50-59).

Petitioner denied Theresa Sexton's allegations that he massaged her breasts and

15

inserted a finger into her vagina.  (Tr. 64-70).  Petitioner denied Barbara Neuens' allegations that he penetrated her vagina with his fingers.  (Tr. 70-74).  Petitioner denied Carrie Kramer's allegations that he twice penetrated her vagina with his fingers.  (Tr. 74-76).  Petitioner denied Mary Ninomiya's allegations that he massaged her breasts.  (Tr. 76-79).  Petitioner denied Candace Arnold's allegations that he massaged her breasts.  (Tr. 79-82).  Petitioner also denied Glenda Steinbrecher's allegations that he massaged her breasts and inserted his finger into her vagina.  (Tr. 82-83).

On cross-examination, Petitioner acknowledged that the video recorded by Stacie Snively revealed that his hand was on Snively's breast.  (Tr. 90).  Petitioner acknowledged that while his female patients were asked to disrobe down to their underwear and wear a gown, he only asked his male patients to remove their shirt.  (Tr. 91).  Petitioner agreed that there are no fibromyalgia tender points "in the vagina" and that massaging the vagina or breasts was beyond the scope of authorized treatment.  (Tr. 91-92).

Following the presentation of evidence, the jury found Petitioner guilty of four counts of Third Degree Criminal Sexual Conduct and two counts of Fourth Degree Criminal Sexual Conduct.  (Trial Transcript, June 25, 2008, 5).  Petitioner was sentenced to serve 85 to 180 months in prison.  (Sentence Transcript, July 21, 2008, 12).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claim:

> I.   The Defendant-Appellant is entitled to a reversal of his conviction where he was denied the effective assistance of counsel as guaranteed by the US Const. AM VI, where defense counsel failed to call expert witnesses and introduce exhibits in support of the defense, and where he stipulated to a joinder of claims after a severance had previously been granted by the trial court.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Nett*, No. 290149, Opinion (Mich. Ct. App., Dec. 22, 2009). Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Nett,* No. 140553, Order (Mich., June 28, 2010). On September 21, 2010, Petitioner initiated the present action in which he asserts the claim identified above.

## STANDARD OF REVIEW

Nett's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307.

18

Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been

19

presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85.  Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.*  If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.          Ineffective Assistance of Trial Counsel

Petitioner asserts that his right to the effective assistance of counsel was violated by his trial counsel's errors.  Specifically, Petitioner faults his trial counsel for: (1) failing to present expert testimony supporting the defense theory of the case; (2) failing to introduce exhibits supporting the defense theory of the case; and (3) stipulating to consolidate in one trial the various charges Petitioner faced.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011).  To establish deficient performance, Petitioner must show that "counsel's representation

20

fell below an objective standard of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [she] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

　　　　Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).  The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

　　　　As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 131 S.Ct. at 740.  Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."  Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.  *Id.*

21

(citations omitted).  As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).


A.      Failure to Present Expert Testimony

Petitioner asserts that his trial counsel rendered ineffective assistance by failing to present any expert witness testimony in support of his theory of the case.  (Dkt. #1 at 4).[3]  According to Petitioner, his theory of the case was that:

> any touching made during treatment was for treatment purposes ONLY and NOT for sexual gratification.  His conduct was strictly to treat fibromyalgia and myofascial pain syndrome.  They were treated primarily with massage therapy by applying pressure to 18 scientifically recognized trigger points.

*Id.*

Inherent in Petitioner's argument is that he did, in fact, touch his victims in the locations alleged, but that such touching was somehow not unlawful.  The Court notes that in his state court appeals, Petitioner expressly conceded this point, arguing that "[h]e acknowledged that he touched the areas that the complainants were talking about, but claimed that it was done for purposes of chiropractic adjustment and to treat fibromyalgia and myofascial pain syndrome."  (Dkt.

_____

[3]  In his amended petition for writ of habeas corpus, Petitioner identifies his sole claim as "ineffective assistance of counsel" as "argued/stated in previously filed brief."  (Dkt. #7).  The Court interprets these comments as incorporating by reference the brief Petitioner submitted in support of his initial habeas petition.  (Dkt. #1).

#25, Appellate Brief at 14).

   The first problem with Petitioner's argument, however, is that such is in complete conflict with the defense he presented at trial.  In his opening statement, Petitioner argued that he "flat out denies" the allegations made by the various complaining witnesses.  (Trial Transcript, June 19, 2008, 186).  As noted above, when Petitioner testified, he denied all of the allegations against him.  In short, Petitioner's theory at trial was that the allegations against him were untrue, not that he did, in fact, touch the victims as alleged but only for medicinal or treatment purposes.

   While expert testimony may very well have been admissible in support of the latter theory (which Petitioner did not pursue), the Court fails to discern any legitimate basis for presenting opinion testimony in support of Petitioner's actual theory that the victims were simply testifying untruthfully.  *See, e.g., People v. Brown*, 2007 WL 3085496 at *2 (Mich. Ct. App., Oct. 23, 2007) ("[e]xpert testimony regarding the credibility of a witness is impermissible, because questions of credibility are solely to be decided by the jury").

   It hardly constitutes deficient performance to fail to question an expert in support of a theory on which an expert's testimony would not be admissible.  Moreover, even if counsel's performance in this regard is considered deficient, Petitioner cannot establish that he was prejudiced thereby as he has failed to establish that there exists any expert witness who would have testified that massaging a patient's breasts or digitally penetrating her vagina is a legitimate treatment for fibromyalgia or myofascial pain syndrome.  The Michigan Court of Appeals rejected this particular claim on the following grounds:

> Defendant first argues that trial counsel's failure to call expert witnesses to support his defense that the touching was for treatment purposes was objectively unreasonable and deprived him of a

23

substantial defense.  We disagree.  Decisions regarding whether to call witnesses at trial are matters of trial strategy.  The failure to call a witness at trial constitutes ineffective assistance of counsel only if it deprives the defendant of a substantial defense.  A substantial defense is one that might have made a difference in the outcome of the trial.  Deference is given to trial counsel's strategic judgments.

Contrary to defendant's argument, trial counsel's failure to call expert witnesses was not objectively unreasonable.  Defendant did not proffer the defense that his conduct was in conformity with chiropractic standards.  Rather, he consistently denied touching the victims in the manner testified to.  Moreover, he acknowledged that massaging a patient's breasts and vagina were outside the scope of the areas that a licensed chiropractor may treat in Michigan and admitted there were no trigger points inside a patient's vagina.  Expert testimony that his actions were consistent with appropriate chiropractic treatments would have been contrary to his defense of complete denial and would have contradicted his statement to police.

In addition, defendant has provided no indication as to who trial counsel could have called as an expert witness or how such an expert would have testified.

*People v. Nett*, No. 290149, Opinion at 1-2 (Mich. Ct. App., Dec. 22, 2009) (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.      Failure to Present Exhibits

Petitioner next faults his trial attorney for failing to introduce into evidence exhibits

that would have supported his defense theory. While Petitioner's pleadings in this Court fail to articulate the precise basis for this claim, in his state court appeals Petitioner alleged that his attorney should have introduced into evidence any of "a multitude of learned treatises sustaining the defense theory of the case." (Dkt. #25, Appellate Brief at 15).

Again, this particular argument is premised on a mischaracterization of Petitioner's actual defense theory and trial strategy. Petitioner did not concede at trial that he touched, for legitimate medicinal or treatment purposes, the victims as alleged, but instead took the position that the allegations against him were untrue. The Court fails to discern how introduction of a "learned treatise" would have advanced Petitioner's theory that the victims had testified untruthfully.

Thus, counsel's conduct in this regard hardly seems deficient. Nevertheless, even if counsel's performance in this regard is considered deficient, Petitioner cannot establish that he was prejudiced thereby as he has failed to identify any exhibit or material supporting the theory that massaging a patient's breasts or digitally penetrating her vagina is a legitimate treatment for fibromyalgia or myofascial pain syndrome. The Michigan Court of Appeals rejected this claim, concluding as follows:

> Second, defendant argues that trial counsel's failure to offer exhibits from professional treatises as evidence to support his defense theory was objectively unreasonable. We disagree. Decisions regarding what evidence to present at trial are matters of trial strategy.
>
> Defendant attached to his brief on appeal several pages from what appears to be a treatise or manual related to chiropractic or massage practice. The pages show the location of various trigger points in the upper and lower back and pelvic areas of the body. Defendant suggests that because the pages demonstrate that he legitimately touched the victims to treat their conditions, trial counsel was ineffective for failing to introduce the pages as exhibits at trial. However, the record reflects that trial counsel introduced an exhibit

that showed various trigger points in the body.  Defendant was given an opportunity to testify about the exhibit, and explained to the jury that the location of the trigger points coincided with the areas he touched when treating the victims.  Accordingly, we fail to see how trial counsel's decision not to introduce the pages as exhibits was not reasonable trial strategy or how counsel's decision prejudiced defendant.

*People v. Nett*, No. 290149, Opinion at 2 (Mich. Ct. App., Dec. 22, 2009) (internal citations omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.      Consolidation of Charges

According to Petitioner, his attorney successfully moved for separate trials concerning certain of the charges against him.  According to Petitioner, counsel subsequently stipulated to joinder (and resolution at one trial) of all the charges against Petitioner.  Petitioner argues that this course of action by his attorney constituted ineffective assistance of counsel.  Petitioner argues that "there is nothing to gain by this action" other than "strengthening the hand of the prosecution."

Even had Petitioner opted for multiple trials, the testimony of every victim would certainly have been admissible at every trial as evidence of Petitioner's scheme or plan to victimize certain of his patients.  *See* Michigan Rule of Evidence 404(b).  Considering such, counsel's decision to consolidate the charges is not unreasonable.  Had Petitioner opted for multiple trials he would

26

have had to secure acquittals from multiple juries in order to avoid incarceration, whereas by

consolidating the charges Petitioner needed only to secure an acquittal from one jury to avoid such.

Thus, the Court is not persuaded that counsel's performance was deficient.

However, even if counsel's performance is deemed deficient in this regard, Petitioner

cannot demonstrate that he was prejudiced as a result.  As noted, whether Petitioner opted for

separate trials or a single trial, the testimony of every victim would almost certainly have been

admissible in each and every proceeding.  The Court further notes that the trial judge instructed the

jury that it must "consider each crime separately" and that it "may find the Defendant guilty of all

or any one or any combination of these crimes, or not guilty."  (Trial Transcript, June 24, 2008, 171).

The Michigan Court of Appeals rejected this claim on the following grounds:

> Defendant was charged in two separate informations.  Plaintiff filed
> a motion, pursuant to MCR 6.120, to consolidate the two cases for
> trial.  Defendant opposed the motion, and successfully argued that the
> trial court should not consolidate the two cases.  Several months later,
> defense counsel stipulated to consolidate the two cases for trial, and
> defendant was tried on all counts at a single trial.
>
> Even assuming that trial counsel's action to stipulate to consolidate
> the two cases for trial was objectively unreasonable, defendant has
> not shown that he was prejudiced by counsel's action.  Evidence of
> each charged offense could have been introduced at each trial under
> MRE 404(b).  Indeed, the prosecutor moved to introduce 404(b)
> evidence regarding uncharged allegations that defendant sexually
> assaulted other patients during treatment.  There is no reason to
> believe that had defendant not stipulated to consolidate the cases,
> plaintiff would not have moved to introduce 404(b) evidence in each
> case.  Moreover, the trial court instructed the jury that it "[m]ust
> consider each crime separately and in light of all of the evidence of
> the case" and that it "may find the Defendant guilty of all or any one
> or any combination of these crimes, or not guilty."  Jurors are
> presumed to follow their instructions.

*People v. Nett*, No. 290149, Opinion at 2 (Mich. Ct. App., Dec. 22, 2009) (internal citations

omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Nett's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: June 13, 2012

 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge